UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

DONALD PATRICK ALLEN TAYLOR,

                          Plaintiff,                        Case No. 1:12-cv-281

v.                                               Honorable Paul L. Maloney

CHAD H. WILLIAMS et al.,

                          Defendants.

_____/

## OPINION

      This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, and state law.  The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff has paid the initial partial filing fee.  Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, Plaintiff's action will be dismissed.  Plaintiff fails to state a claim under §§ 1983, 1985, or 1986.  The Court declines to exercise jurisdiction over Plaintiff's state law claims.

**Factual Allegations**

Plaintiff Donald Patrick Allen Taylor is a state prisoner incarcerated with the Michigan Department of Corrections (MDOC) at the Carson City Correctional Facility (DRF). He sues the following employees of DRF: Assistant Resident Unit Supervisors (ARUS) Chad Williams and Joseph Niemiec; Corrections Officers Steve Lacy and Scott Fleischer; Deputy Warden Tony Trierweiler; Litigation Coordinator Jacque Koenigsknecht; Grievance Specialists Kent Austin and Unknown Party (identified as "John Doe"); and R.D. Russell. He also sues the following members of the Michigan Commutation and Parole Board: Barbara Sampson, Jodi DeAngelo, Stephen DeBoer, and David Kleinhardt.

In his *pro se* complaint, Plaintiff alleges that he was convicted of first-degree criminal sexual conduct (CSC) in 1989 after pleading guilty to the anal sexual penetration of a 17-day-old infant. In 1991, he was sentenced to 20 to 60 years' imprisonment, and he has been confined in various MDOC facilities since that time. In the early 1990's, Plaintiff developed an interest in creating artwork and he began collecting pictures from newspapers and magazines and placing them in scrapbooks. In 1995, Plaintiff saw the photograph of a child lying in the arms of an Oklahoma City fire-fighter, taken shortly after the bombing of the Alfred P. Murrah Federal Building. After seeing that picture, Plaintiff had an "epiphany"; he became remorseful for his crime and "sensitive to violence against women and children." (Compl. ¶¶ 35, 39, docket #1.) Since that time, Plaintiff has been collecting pictures of children for the purpose of creating artwork "to speak out against domestic abuses[.]" (*Id.* at ¶ 39.)

Initially, Plaintiff kept his pictures in one expandable scrapbook/photo album, but as his collection grew over time, he had to purchase several more albums to accommodate it (such

- 2 -

scrapbooks/albums will be referred to, collectively, as "the Scrapbook").[1]  In 2002, the MDOC changed its policy regarding limits on prisoner personal property such that prisoners could keep only one photo album or scrapbook.  Plaintiff possessed more than one scrapbook at the time, but he did not reduce the size of his collection because prison staff did not strictly enforce the one-scrapbook limitation.  Plaintiff did, however, comply with the routinely-enforced rule that a prisoner's personal property must fit within one state-issued duffel bag and one prisoner-owned footlocker.

In 2007, Plaintiff was transferred to the Boyer Road Correctional Facility (OTF).[2] At OTF, Officer Lacy regularly harassed Plaintiff by claiming that Plaintiff's Scrapbook was contraband.  However, Lacy never confiscated the Scrapbook or took any other disciplinary action at that time.  On July 8, 2009, Lacy saw Plaintiff working on his Scrapbook and told Plaintiff that the Scrapbook and magazines were contraband because of "cutouts."  (Compl. ¶ 60, docket #1.) Plaintiff asked Lacy to clarify the meaning of "scrapbook" under the prison's policy.  Lacy refused to do so.  Less than an hour later, Plaintiff went to the ARUS's office to ask for some tape.  When he arrived, he saw Officers Lacy and Fleischer in the office with ARUS Williams.  After Plaintiff requested some tape, Lacy stated, "How much contraband do you need down there!"  (Compl. ¶ 66.) Plaintiff knew that Lacy was referring to the Scrapbook, so he asked Lacy to define scrapbook. Lacy responded, "Oh, that's right.  I better read [the] policy."  (*Id.* at ¶ 69.)  Plaintiff told Lacy that he had a due-process right to know the meaning of prison policy, and that he understood that a

---

[1]Much of the complaint refers to Plaintiff's "scrapbook," in  singular form, even when it is clear that Plaintiff is referring to a collection of several albums or "scrapbooks."  (*See, e.g.,* Compl. ¶¶ 73, 74 (noting that Fleischer confiscated Plaintiff's "scrapbook and related materials," which included several photo albums or "scrapbooks").)  For the sake of clarity, the Court will use the capitalized term "Scrapbook" when referring to the entire collection of Plaintiff's albums and scrapbooks at issue in the complaint.  The term "scrapbook," on the other hand, will refer to one individual album or book.  Thus, Plaintiff's Scrapbook consists of several scrapbooks.

[2]OTF merged into DRF in 2010.

scrapbook is for "pictures, clippings and mementos," but neither Lacy, Fleischer nor Williams attempted to clarify the policy. (*Id.* at ¶ 70.) Instead, Williams told Lacy and Fleischer, "If you don't want him to have it, I don't care. Go ahead and take it." (*Id.*)

The next day, while Fleischer was conducting cleanliness inspections and security rounds, he saw Plaintiff in his cell working on his Scrapbook, but Fleischer made no comment. Later, while Plaintiff was at lunch, Fleischer searched Plaintiff's cell and confiscated the Scrapbook and related materials.[3] Fleischer then filed a misconduct report claiming that he found several items of contraband in Plaintiff's cell, including a brown photo album that was "altered from its original condition," a black photo album that "has been altered and has another prisoner's number inside," a brown photo album "with 101 loose pages (altered from original condition)," "four plastic coils (removed from albums)," and six zip ties. (Compl. ¶ 73, docket #1; *see also* Notice of Intent to Conduct an Admin. Hr'g, docket #1-1, Page ID#51.)

Plaintiff prepared a detailed response to the misconduct report in which he summarized numerous prison policies related to scrapbooks and contraband. He also noted that the misconduct report did not indicate the manner in which the photo albums were altered. With respect to the album with another prisoner's number inside, Plaintiff asserts that he obtained it from prisoner Jensen, and that it was in the same condition as when Jensen originally purchased it. Plaintiff contends that he has neither seen nor heard of any other prisoner having the same type of scrapbook confiscated on the basis that it is contraband.

Under MDOC policy, the staff member who conducts the misconduct hearing must not have had direct involvement in the matter at issue, so Plaintiff requested that ARUS Williams

---

[3]Fleischer confiscated only those scrapbooks on top of Plaintiff's footlocker. If Fleischer had opened the footlocker, he would have discovered two additional scrapbooks. (Compl. ¶ 74, docket #1.)

be disqualified as the hearings officer. At first, Williams refused. Plaintiff then told Williams that Fleischer would not have confiscated the Scrapbook but for Williams' "endorsement" of Lacy's "plan." (Compl. ¶ 82.) Williams responded, "You know what, smart guy? I will disqualify myself and let RUM Miller handle it; let her see what you've got down there. And you wonder why the parole board keeps giving you twenty fours." (Compl. ¶ 83.)

A "twenty four" is a decision by the parole board to deny parole to a prisoner and continue that prisoner's incarceration for twenty-four months before making another parole determination. Plaintiff was alarmed by Williams' statement because he had never received a "twenty four" from the parole board.

Shortly thereafter, on July 15, 2009, Williams issued a notice of intent to conduct an administrative hearing ("NOI") regarding the contraband charge.[4] (*See* NOI, docket #1-1, Page ID#51.) According to Plaintiff, prison policy provided that a staff member "'other than the person who issued the [NOI]'" must review it with the prisoner. (Compl. ¶ 89, docket #1 (paraphrasing MDOC Policy Directive 03.03.105(G).) Nevertheless, Williams reviewed the NOI with Plaintiff. Williams' involvement in review of the NOI troubled Plaintiff. He feared that he would lose his Scrapbook or that Williams would influence Plaintiff's eligibility for parole. So, instead of challenging the contraband charge at a hearing, he waived his right to a hearing and agreed to the disposal of most of his property. Plaintiff asked to keep some the items from the Scrapbook,

---

[4]A prisoner charged with possession of contraband typically receives either a misconduct report or an NOI. MDOC Policy Directive 04.07.112 ¶ GG (Nov. 15, 2004). A misconduct report leads to a disciplinary hearing on the misconduct charge. *See id.* An NOI leads to an administrative hearing to resolve the disposition of the property believed to be contraband. *See id.* at ¶ HH. Though Fleischer charged Plaintiff with a misconduct, Williams allegedly "aborted" the misconduct proceedings in lieu of an administrative hearing. (Compl. ¶ 174, docket #1.)

including some keepsakes, a few pictures of children, and the photograph from the Oklahoma City bombing. Williams agreed to that request.

In September 2009, Plaintiff prepared a complaint on behalf of another prisoner who claimed that Officer Sherri Reddin (who is not named as a Defendant in this action) gave two prisoners a list of inmates with CSC convictions so that they could harass and intimidate those inmates. Plaintiff's name was on that list. Reddin also shared information about Plaintiff's case to inmates Manciaz and Spanke. Plaintiff asserts that the supervisors at DRF have not taken action to correct or prevent the harassment of prisoners with CSC convictions.

In February 2010, Plaintiff submitted several pieces of artwork for inclusion in an art exhibition held by the University of Michigan; the following pieces were selected for the exhibition:

a. "Make It Better," a 14 x 17 inch graphite drawing depicting a toddler suffering from burns sustained in a natural disaster. . . .

b. "A Reason to Not War," a 14 x 17 inch pastel painting depicting the broken, lifeless body of a young girl, maybe six years old, laying face down in bombing debris.

c. "Something to Make You Smile," a 14 x 17 inch pastel painting depicting an infant tackling the feet of an adult. . . .

(Compl. ¶ 96.)

Plaintiff was due to have a parole hearing on May 4, 2010, so he advised RUM Miller that he wanted to review his "counselor file," which is a file containing information considered by the parole board when making a parole determination. *See* MDOC Policy Directive 06.05.104 ¶ T. Among other things, the file contains "Parole Eligibility/Lifer Review Reports" (PERs), *see id.*, which are reports prepared by MDOC staff at the request of the parole board, *see* MDOC Policy

Directive 06.05.103 ¶¶ E-H.  PERs provide information about the prisoner's adjustment and conduct in prison to assist the parole board in making parole decisions.  Under MDOC policy, a prisoner must be given a reasonable opportunity to review his counselor file after a new PER is completed. Miller did not act on Plaintiff's request at that time.

Williams completed a new PER for Plaintiff on March 31, 2010.  It contained no unfavorable information about Plaintiff.  It did not mention the misconduct report by Fleischer or the NOI by Williams.  Prior to the parole hearing, Plaintiff scored a "high probability" for parole. (Compl. ¶ 99, docket #1.)

Defendant Kleinhardt interviewed Plaintiff for parole on May 4, 2010.  Williams was present at the interview but did not speak regarding Plaintiff's parole.  When the interview was complete, Kleinhardt told Plaintiff that he was going to give Plaintiff a "deferral" for a psychological evaluation and then discuss a decision with his colleagues.  (Compl. ¶ 109.)  Before Plaintiff received a psychological evaluation, however, he received notice from the parole board that it had decided to deny parole and continue his imprisonment for twenty-four months before making another parole determination.  In a written notice of its decision, the board stated:

> [Plaintiff] greatly minimizes [the] cause of injuries in an extremely violent sex crime on an infant.  [Plaintiff] was recently found in possession of random infant pictures cut out of a magazine. [Plaintiff] remains a great danger and risk to the public.

(Compl. ¶ 111.)  The decision was signed by Defendants DeAngelo and DeBoer.

A friend of Plaintiff's submitted a FOIA request to the MDOC to determine the basis for the parole board's decision.  Through that process, Plaintiff was able to obtain a copy of some of the documents reviewed by the parole board, though none of them indicated when or how the parole board learned about the photos in Plaintiff's possession.  On November 18, 2010, Williams

- 7 -

told Plaintiff that "he would have given [Plaintiff] a copy of 'that memo' if [he] had asked for one." (Compl. ¶ 126.) When Plaintiff asked about the "memo" that Williams was referring to, Williams responded, "The one I sent to the parole board about you having pictures of babies. You didn't have to FOIA it." (*Id.* at ¶ 128.) Williams told Plaintiff that he did not have the "memo" at the moment because it was in the possession of another officer, but that Plaintiff would not be "getting pictures of any babies." (*Id.*)

Plaintiff alleges that the following pictures of infants and children were among those in the Scrapbook when it was seized by Fleischer: (1) "a full-page advertisement for Lever 2000 Soap . . . [d]epicting an infant tackling the feet of an adult"; (2) "a hospital advertisement . . . depicting a mother and her newborn daughter looking into each other's eyes"; (3) a "newspaper advertisement depicting a newborn's hand held against an adult's"; (4) an "advertisement for Lever 2000 . . . depict[ing] [an infant] . . . mouthing the toe of an adult's foot"; (5) an "advertisement show[ing] a proud mother standing behind her son, with her hands on his shoulders"; and (6) "[f]rom stationary . . . , two caricatures of a blond infant poking his head through the paper[.]" (Compl. ¶ 131.)

On December 1, 2010, Plaintiff filed a prisoner grievance complaining that Williams secretly informed the parole board that Plaintiff "possessed random infant pictures cut out of a magazine." (*Id.* at ¶ 134.) Plaintiff requested that Williams' letter to the parole board be expunged from his prison record. The grievance was denied at step I of the grievance process because no such document existed in Plaintiff's file.

Plaintiff appealed the denial to step II of the grievance process. Defendant Sampson, responding to the appeal, acknowledged the existence of a letter written by ARUS Williams to the

parole board, attached to which were five pages of pictures of infants and children (hereinafter, the "Memo").  Plaintiff then appealed the step II response, requesting a new parole interview because the Memo was not disclosed to him prior to that interview, in violation of prison policy.  Defendants Austin and Russell denied the appeal at step III of the grievance process.

Plaintiff believes that his friend outside prison later obtained a copy of the Memo and its attachments through a FOIA request and then sent them in the mail to Plaintiff, but Plaintiff never received them.  The mailroom at DRF inspects all incoming prisoner mail for contraband and then distributes permissible mail to the various housing units at the facility.  (*Id.* at ¶ 144.)  After arrival at the housing units, the mail is sorted by housing unit staff in the ARUS's office before distribution to inmates.  Plaintiff believes that ARUS Williams intercepted the documents from Plaintiff's friend because Plaintiff's mail was sorted in Williams' office, and because Williams had told Plaintiff that he would not be "getting any pictures of babies."  (*See* Compl. ¶ 146, docket #1.)

On January 3, 2011, Plaintiff filed another grievance complaining that he received a twenty-four month continuance of consideration for parole because Williams told the parole board that Plaintiff possessed "random infant pictures cut out of a magazine."  (*Id.* at ¶ 147.)  Plaintiff requested that the Memo be removed from his prison file.  Defendants Koenigsknecht and Niemiec rejected the grievance as untimely.  Plaintiff appealed the denial of his grievance, complaining that he only recently learned about the Memo.  Defendant Trierweiler rejected the appeal at step II of the grievance process, contending that Plaintiff's original grievance was vague.  After Plaintiff appealed the decision regarding his grievance a second time, Defendant Doe rejected his appeal.  Doe's response was approved by Defendant Russell.

On or around February 15, 2011, another prisoner incarcerated at DRF, Roy Shattuck, heard Williams tell Fleischer, "As long as I have anything to do with it, [Taylor is] never going home."[5] (*Id.* at ¶ 153.)

Plaintiff contends that Defendants' conduct violated his rights under the United States Constitution, the Michigan Constitution, state law, and prison policies.  As relief, Plaintiff seeks an injunction, a declaratory judgment, and compensatory and punitive damages.

## Discussion

### I.    Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.

---

[5]Shattuck's affidavit, which is attached to the complaint, states, in relevant part:

I heard Fleischer say to Williams, "What a dumb-ass Taylor was for having that shit.  I thought he was smarter than that.  At least now I don't have to shake him down anymore."

They began talking derogatory about Taylor and his crime when I heard Williams state, "As long as I have anything to do with it, he's never going home.  He's a sick, twisted fuck."

(Aff. of Roy Shattuck ¶¶ 17-18, Ex. 3 to Compl., docket #1-3.)

Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff asserts throughout the complaint that Defendants violated his rights under the Michigan Constitution of 1963, Michigan state law, and MDOC policies. Section 1983 does not provide redress for a violation of a state law or prison policies. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Thus, the Court examines Plaintiff's allegations to determine if they state a violation of federal law.

Furthermore, Plaintiff asserts that Defendants improperly denied him release on parole, which potentially calls into question the validity of his present confinement. A challenge

to the fact or duration of confinement ordinarily should be brought as a petition for habeas corpus and is not the proper subject of a civil rights action brought pursuant to § 1983. *See Preiser v. Rodriguez*, 411 U.S. 475, 484, 494 (1973) (the essence of habeas corpus is an attack by a person in custody upon the legality of that custody and the traditional function of the writ is to secure release from illegal custody).

In addition, the Supreme Court has held that a state prisoner cannot make a cognizable claim under § 1983 for an alleged unconstitutional conviction or for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless a prisoner shows that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . ." *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (citation omitted); *see also Edwards v. Balisok*, 520 U.S. 641, 646–48 (1997). In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court clarified the *Heck* rule, holding that "a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81-82.

Thus, to the extent Plaintiff claims that the parole board denied him parole for the wrong reasons and that he is, therefore, entitled to release, his action would be *Heck*-barred because such a claim would necessarily call into question the validity of Plaintiff's present confinement. *See Wilkinson*, 544 U.S. at 81–82. However, to the extent Plaintiff claims that he was not afforded an

opportunity to challenge the basis for the parole board's decision, and that he is, therefore, entitled to a new parole hearing, his action is not *Heck*-barred. *See id.* at 82.

Plaintiff challenges the substantive basis for the parole board's decision as well as the procedures used in making that decision. He apparently claims that he would have received a favorable parole decision but for the fact that the parole board improperly considered his protected conduct (*i.e.*, his Scrapbook) as a basis for denying parole. That claim implies that his present confinement is invalid, and as such, it may be *Heck*-barred.

In addition, Plaintiff claims that he was not given an opportunity to respond to the Memo before the parole board made its decision. The latter claim does not necessarily imply that his present confinement is invalid; instead, it implies that he is entitled to a new parole hearing. Thus, Plaintiff's complaint contains some claims that may be *Heck*-barred and some that are not. The Court need not resolve which claims are barred, however, because Plaintiff does not state a claim for the reasons that follow.

### A. First Amendment

Plaintiff claims that the confiscation of his Scrapbook violated his right to freedom of expression under the First Amendment, and that Defendants' decision to deny him parole because of the contents of his Scrapbook impinged on his right to engage in "protected speech related to infants and children." (Compl. ¶¶ 162, 202, docket #1.) The First Amendment ordinarily prevents the state from "inquir[ing] about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 7 (1971). It protects both the right to speak freely and the right not to speak at all. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). As the Supreme Court repeatedly has recognized, however, the fact of

- 13 -

incarceration necessarily imposes "limitations on constitutional rights, including those derived from the First Amendment[.]"  *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977). A prisoner retains only those First Amendment rights that are not "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Plaintiff does not challenge the validity of a prison rule or regulation; instead, he challenges individual acts that were allegedly taken in response to the exercise of his First Amendment rights.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a claim that Defendants retaliated against him for exercising his First Amendment rights, Plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985).  "[A]lleging merely the ultimate fact of retaliation is insufficient."  *Murphy*, 833 F.2d at 108.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"  *Harbin-*

*Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).

Plaintiff apparently contends that the creation and possession of his Scrapbook was itself protected conduct.  However, Plaintiff does not have a constitutional right to create and keep a collection of pictures in a personal scrapbook.  Moreover, that activity is not "speech" protected by the First Amendment.  The free-speech protections in the First Amendment generally do not apply to mere conduct.  *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005).  The Supreme Court has rejected the notion that "'an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea[.]'"  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  Rather, conduct must be "sufficiently imbued with elements of communication" to be entitled to First Amendment protection.  *Id.*  (citing *Spence v. Washington*, 418 U.S. 405, 409 (1974)).  That threshold is "not a difficult one," however, as "'a narrow, succinctly articulable message is not a condition of constitutional protection.'"  *Blau*, 401 F.3d at 388 (quoting *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995)).

Plaintiff asserts that he used the pictures in the Scrapbook to speak out against domestic abuses, but merely collecting and organizing pictures of infants and children and placing them in a personal scrapbook does not communicate anything on that issue.  Moreover, communication implies that there is an audience as well as a speaker.  *See Swank v. Stewart*, 898 F.2d 1247, 1250-51 (7th Cir. 1990) ("The purpose of the free-speech clause . . . is to protect the market in ideas, . . . broadly understood as the public expression of ideas, narratives, concepts,

imagery, opinions—scientific, political, or aesthetic—*to an audience* whom the speaker seeks to inform, edify, or entertain.") (Posner, J.) (emphasis added). Plaintiff does not identify an audience for the pictures of infants and children in his Scrapbook.  While Plaintiff alleges that he used some of those pictures to create art for public display, he does not allege that Defendants prevented him from creating or displaying his artwork, or took any action against him for doing so.  On the contrary, he submitted several pieces of art for an art exhibition several months after Defendants confiscated his Scrapbook, apparently without any adverse consequences.  In short, it is not at all clear that the Scrapbook itself, or Plaintiff's creation and possession of it, satisfies the basic criteria for speech or conduct protected by the First Amendment.

Even assuming that the Scrapbook does meet such criteria, however, it was not protected conduct as far as Plaintiff was concerned, because he acknowledges that it violated the MDOC's property policies.  Under MDOC policies in effect at the time, "contraband"included:

> any personal property which is not specifically authorized by this policy, authorized property which is in excess of allowable limits, authorized property which has been altered, authorized property which was obtained or sent from an unauthorized source, . . . [and] authorized property which belongs to another prisoner.

MDOC Policy Directive 04.07.112 ¶ EE (Nov. 15, 2004).  Plaintiff was authorized to possess only "[o]ne photo album/scrapbook without wire/metal binding," which must be "labeled with [his] identification number."  MDOC Policy Directive 04.07.112C ¶ 33 (Oct. 20, 2008).  The NOI identifies multiple photo albums/scrapbooks that were taken from Plaintiff's cell, and Plaintiff himself acknowledges that he possessed more than one album/scrapbook, in violation of policy. (*See* Compl. ¶ 43, docket #1 ("[D]espite the limitation of one [scrapbook], I had several.").)  The NOI also indicates, and Plaintiff acknowledges, that one of the scrapbooks was marked with another

prisoner's identification number.  Thus, it was contraband for that additional reason.  *Cf.* MDOC Policy 03.03.105C (Jan. 1, 2007) (describing a "common" example of a minor contraband violation as "[p]ossession of  . . . anything with someone else's name or number on it").

Conduct that violates a legitimate prison regulation is not protected by the First Amendment.  *See Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008).  Plaintiff does not challenge the validity of the foregoing regulations.  Indeed, they are based on patently legitimate penological interests in monitoring and controlling the source and quantity of property possessed by prisoners.  Thus, Plaintiff cannot satisfy the first element of a First Amendment claim by relying solely on his Scrapbook as protected conduct.  *See id.*

Alternatively, Plaintiff asserts that various Defendants retaliated against him for statements and complaints that he made to them.  The Court will address those incidents in turn.

### 1.  Lacy's comments

Lacy allegedly violated Plaintiff's First Amendment rights by telling Plaintiff on multiple occasions that the Scrapbook was contraband.  Those comments were not preceded by, or related to, any protected conduct; thus, Plaintiff cannot plausibly claim that they violated his First Amendment rights.

### 2.  Confiscation of the Scrapbook and misconduct charge

After hearing the exchange between Plaintiff and Lacy about the meaning of "scrapbook" under prison policy, Williams indicated to Lacy and Fleischer that they could confiscate the Scrapbook, and Fleischer subsequently confiscated it as contraband.  Here, the First Amendment claim fails because Plaintiff implicitly acknowledges that the Scrapbook was, in fact, contraband.

- 17 -

Plaintiff's claim is akin to a retaliatory prosecution claim. In other words, Plaintiff asserts that Williams and Fleischer "prosecuted" him under the prison's contraband rules in retaliation for his complaints about prison policy. In *Hartman v Moore*, 547 U.S. 250 (2006), the Supreme Court concluded that a plaintiff bringing a First-Amendment retaliatory prosecution claim must plead and prove the absence of probable cause. In *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006), the Sixth Circuit held that, applying *Hartman,* a claim of First-Amendment retaliatory arrest requires a plaintiff to plead and prove the absence of probable cause. The Supreme Court subsequently declined to decide whether a retaliatory arrest was actionable if supported by probable cause. *See Reichle v. Howards*, 132 S. Ct. 2088 (2012). Instead, the Court held that the officers were entitled to qualified immunity because it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. *Id.* at 2096.

A prison misconduct charge does not precisely parallel either an arrest or a prosecution, but it is comparable to one of those two things. Accordingly, under the reasoning of *Hartman* and *Barnes* collectively, a prisoner's claim of a retaliatory misconduct charge must plead and prove the absence of probable cause. Where, as here, a prisoner concedes behavior supporting the charge, but disputes the motive of the charging officer, the claim is barred. In other words, because the confiscated property was contraband, Plaintiff cannot state a retaliation claim against Defendants for charging him with possession of contraband, or for confiscating the Scrapbook pursuant to that charge. *Cf. Patterson v. Godward*, No. 12–1282, 2012 WL 5477102, at *2 (6th Cir. Nov. 9, 2012) ("A finding of guilt based upon some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim.'") (quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994)).

- 18 -

3.  <u>Review of the NOI</u>

Plaintiff also contends that Williams issued and/or reviewed the NOI to deter Plaintiff from exercising his right to a hearing on the contraband charge.  None of Plaintiff's allegations indicate that Williams intended to deter Plaintiff from exercising that right, however.  In addition, Plaintiff fails to allege any meaningfully adverse consequences as a result of Williams' conduct.  The purpose of the NOI review is to notify the prisoner of the charges before a hearing.  It does not resolve the merits of those charges.  In fact, because Williams issued the NOI, he was not permitted to be the hearing officer.  *See* MDOC Policy Directive 04.07.112 ¶ HH (Nov. 15, 2004).  Thus, even if Williams improperly involved himself in the NOI process, which is doubtful,[6] Plaintiff fails to indicate how that involvement had, or could have had, an adverse impact on him.  Consequently, Williams' review of the NOI was not an adverse action for purposes of a retaliation claim.

4.  <u>"Twenty-fours" comment</u>

Plaintiff also suggests that Williams' comment about Plaintiff receiving "twenty fours" from the parole board was a threat in retaliation for Plaintiff's request to have Williams disqualified as the hearings officer.  Williams told Plaintiff, "I will disqualify myself and let RUM Miller handle it; let her see what you've got down there.  And you wonder why the parole board keeps giving you twenty fours."  (Compl. ¶ 83, docket #1.)  Unlike the threats in *Thaddeus-X* and *Yarrow*, the foregoing statement did not threaten any adverse consequences for Plaintiff.  Rather, it incorrectly asserted that Plaintiff had received "twenty fours" from the parole board.  Moreover,

---

[6]Plaintiff misleadingly paraphrases prison policy to assert that the official issuing an *NOI* cannot review it with the prisoner.  (*See* Compl. ¶ 89.)  However, the policy cited by Plaintiff states that "[a] staff member other than the person who issued the minor *misconduct report* shall conduct a review of the minor *misconduct report* with the prisoner."  MDOC Policy Directive 03.03.105 ¶ G (Aug. 16, 2010) (emphasis added).  Fleischer issued the misconduct report, not Williams.  (*See* Compl. ¶ 73.)  Thus, Williams did not violate prison policy by issuing or reviewing an NOI with Plaintiff.

it implied that the "twenty fours" were due to "what [Plaintiff has] got down there" (*i.e.*, the Scrapbook/contraband), rather than Plaintiff's request to disqualify Williams.  (*See id.*)  Thus, Williams' statement was not a threat, much less an adverse action.

### 5. Memo to the parole board

Plaintiff claims that Williams sent the Memo to the parole board in retaliation for Plaintiff's protected conduct, but Plaintiff's allegations do not provide a plausible connection between the Memo and any protected conduct.  Clearly, Plaintiff's picture collection was the impetus for the Memo, but as indicated, merely collecting and/or possessing pictures in a scrapbook is not protected conduct.  *See* Section I.A., *supra*.  There is no indication that Williams wrote the Memo in response to any other conduct that might be protected, such as complaints or grievances directed at prison officials.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation.).  Thus, Plaintiff does not state a retaliation claim against Williams.

### 6. Parole denial

Finally, Plaintiff contends that members of the parole board violated his First Amendment rights when they considered the information in the Memo as a basis for denying parole.  That decision, Plaintiff contends, constitutes a "blanket restriction on protected speech related to infants and children."  (Compl. ¶ 202.)  Plaintiff's claim erroneously assumes that his picture-collection was itself protected speech.  Moreover, Plaintiff's statement is unfounded.  Clearly, nothing in the parole board's decision prevents Plaintiff from reading, writing, speaking, or even creating art related to infants and children.  And as Plaintiff himself attests, it also does not prevent him from accessing materials with pictures of infants and children through the mail or in the prison

library. (*See* Compl. ¶ 215, docket #1.) At the most, it discourages him from amassing a collection of pictures, which is a minimal burden on the exercise of his First Amendment free-speech rights, if at all.

In any event, the First Amendment does not bar the parole board from considering Plaintiff's picture-collecting conduct as a factor in determining whether parole is warranted. In a similar context, the Sixth Circuit determined that the parole board can consider a prisoner's refusal to admit guilt as a basis for denying parole. *See Hawkins v. Morse*, No. 98–2062, 1999 WL 1023780, at *2 (6th Cir. Nov. 4, 1999). That consideration does not violate the prisoner's First Amendment right *not* to speak, in part, because it is reasonably related to a legitimate penological interest, namely, the rehabilitation of prisoners. *See id.* The same interest justifies the parole board's actions in Plaintiff's case. Given that an infant was the target and victim of Plaintiff's offense, Defendants could reasonably conclude that Plaintiff's picture collection was evidence of an undue fixation on the type of person victimized by his crime and, thus, that Plaintiff needed further rehabilitation before release. Consequently, even if Plaintiff's First Amendment claim against the parole board is not *Heck*-barred, it is without merit.

## B. Due Process

Plaintiff also claims that Defendants deprived him of his right to (procedural) due process under the Fourteenth Amendment. "The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). "[T]hose who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Accordingly, a procedural due process analysis addresses two questions. "[T]he first asks whether there exists a

- 21 -

liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).  Due process of law requires notice and an opportunity to be heard before a prisoner is deprived of any significant property or liberty interest.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citing *Mullane v. Cent. Hanover Bank & Trust*, 444 U.S. 277, 284 n.9 (1980)); *see also Wolff v. McDonnell*, 418 U.S. 539, 563-68 (1974) (minimal due process protections required before a prisoner may be deprived of a protected liberty interest are notice, a written statement of reasons for the action, and an opportunity to be heard).  The interests at issue in the complaint are:  (1) property interests in the Scrapbook and other materials confiscated by Defendants; and (2) a liberty interest in early release on parole.

### 1. Scrapbook.

Plaintiff received notice that his Scrapbook was confiscated as contraband before a contraband hearing was to be held, but he did not receive a hearing on the matter.  Defendants cannot be faulted for that outcome, however, because Plaintiff affirmatively waived his right to a hearing and agreed to the disposition of his property.  (*See* NOI, docket #1-1, Page ID#51.)

Nevertheless, Plaintiff apparently contends that the process offered to him was deficient because Williams involved himself in the NOI review process, in violation of prison policy.  However, Plaintiff does not indicate how Williams deprived Plaintiff of the due process rights guaranteed by the Fourteenth Amendment, *i.e.*, notice and an opportunity to be heard before an impartial decision-maker.  Williams gave Plaintiff notice of the charges, and Plaintiff was given

an opportunity for a hearing, but he chose not to take it. The policy violation identified by Plaintiff does not, in itself, give rise a Fourteenth Amendment claim.

Furthermore, even if Williams' conduct itself deprived Plaintiff of due process, Plaintiff's claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Plaintiff's claim is expressly premised upon allegedly unauthorized acts of a state official; he asserts that Williams violated prison policy. Thus, Plaintiff must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995). He has not done so. The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *Id.* at 480. Therefore, Plaintiff does not state a procedural due process claim with respect to the loss of his Scrapbook and related materials.

### 2. Mail

Plaintiff contends that Williams confiscated some personal mail from a friend without issuing a mail-rejection notice and without providing Plaintiff an opportunity to challenge that action. In other words, Plaintiff asserts that Williams confiscated his property without following established prison procedure. *Parratt* applies to this sort of claim. Because Plaintiff does not allege

- 23 -

that post-deprivation procedures are inadequate, his claim is barred.  *See Copeland*, 57 F.3d at 479-80.

### 3. Parole

Plaintiff also claims that he was entitled to notice and an opportunity to be heard regarding the information in the Memo before the parole board made its decision.  Plaintiff fails to raise a claim of constitutional magnitude, however, because he has no liberty interest in being released on parole.  There is no constitutional or inherent right to be conditionally released before the expiration of a prison sentence.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).  Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release.  *Id.* at 7, 11; *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  Rather, a liberty interest is present only if state law entitles an inmate to release on parole.  *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).

In *Sweeton v. Brown*, 27 F.3d 1162, 1164-165 (6th Cir. 1994) (en banc), the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole.  In a recent published decision, the Sixth Circuit reiterated the continuing validity of *Sweeton*.  *See Crump v. Lafler*, 657 F.3d 393, 404 (6th Cir. 2011).  In *Crump*, the court held that the adoption of specific parole guidelines since *Sweeton* does not lead to the conclusion that parole release is mandated upon reaching a high probability of parole.  *See id.*; *see also Carnes v. Engler*, 76 F. App'x 79, 80 (6th Cir. 2003).  In addition, the Michigan Supreme Court has recognized that there exists no liberty interest in parole under the Michigan system.  *Glover v. Mich. Parole Bd.*, 596 N.W.2d 598, 603-04 (Mich. 1999).

Until Plaintiff has served his maximum sentence, he has no reasonable expectation of release. The discretionary parole system in Michigan holds out "no more than a mere hope that the benefit will be obtained." *Greenholtz*, 442 U.S. at 11. Therefore, Defendants' failure to notify Plaintiff of the Memo before the parole board's decision implicates no federal right.

In sum, Plaintiff does not state a due process claim because he has not identified a deficiency of constitutional magnitude in the process used to deprive him of his Scrapbook, he does not allege that post-deprivation proceedings are inadequate with respect to the loss of his mail, and he does not have a protected interest in release on parole.

### C. Equal Protection

Plaintiff further claims that the confiscation of his property violated his right to equal protection because he is not aware of any other prisoner having the "same model" of photo album or scrapbook confiscated because it is "altered" or is otherwise contraband. (Compl. ¶ 177, docket #1.) He also asserts that the denial of parole violated his right to equal protection because he did not receive an opportunity to respond to the Memo.

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Plaintiff does not suggest that he is a member of a suspect class, and "prisoners are not considered a suspect class for purposes of equal protection litigation." *Jackson v. Jamrog,* 411 F.3d 615, 619 (6th Cir. 2005); *see also Wilson v. Yaklich,* 148 F.3d 596, 604 (6th Cir. 1998). In addition, prisoners

do not have a fundamental right under the Constitution to make and keep scrapbooks, or to obtain release on parole.

Because neither a fundamental right nor a suspect class is at issue, the rational basis review standard applies. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006). "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)). To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Plaintiff's claim is wholly conclusory. Plaintiff fails to identify any individuals similarly situated in all relevant respects who were treated differently from him. Consequently, Plaintiff does not state an equal protection claim.

### D. Fourth Amendment

Plaintiff contends that Defendants violated his Fourth Amendment rights by seizing his property "in the absence of a valid penological interest." (Compl. ¶ 168.) In *Hudson v. Palmer*, the Supreme Court considered and rejected a Fourth Amendment claim similar to Plaintiff's. *See Hudson*, 468 U.S. at 517. In that case, a prison official searched a prisoner's cell and destroyed some of his legal papers in the process. *Id.* at 519, 535. The prisoner claimed that the prison

- 26 -

official's conduct constituted an unreasonable search and seizure of his property, in violation of the Fourth Amendment.  *Id.* at 530.  The Court disagreed.

First, the Court recognized that while prisoners are not beyond the reach of the Constitution, "curtailment of certain rights is necessary, as a practical matter, to accommodate a 'myriad of institutional needs and objectives' of prison facilities, . . . chief among which is internal security." *Id.* at 523-24 (internal citation omitted).  The Court then determined that the official's *search* of the prisoner's cell did not violate the Fourth Amendment because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Id.* at 526.  According to the Court, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527-28.

For similar reasons, the Court held that the *seizure* of the prisoner's property did not violate the Fourth Amendment.  *Id.* at 528 n.8.  According to the Court, "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.*  Thus, "the Fourth Amendment does not protect against seizures in a prison cell[.]" *Id.*

Applying *Hudson* to Plaintiff's case, the Fourth Amendment did not prohibit Defendants from searching his cell.  Moreover, it did not prevent them from confiscating items in Plaintiff's cell, including his Scrapbook, on the basis that they appeared to be contraband. Therefore, Plaintiff does not state a Fourth Amendment claim.

### E.  Eighth Amendment

Plaintiff asserts that the Memo and the decision to deny him parole on the basis of his Scrapbook "punishes" his "rehabilitation," in violation of the Eighth Amendment.  (Compl.

¶ 225, docket #1.)  The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Clearly, neither the Memo, nor the parole board's decision that Plaintiff should continue to serve his sentence of incarceration, nor any other action alleged in the complaint subjected Plaintiff to "unnecessary and wanton infliction of pain" or deprived him of the "minimal civilized measure of life's necessities."  *See Rhodes*, 452 U.S. at 346-47.  Thus, Plaintiff's Eighth Amendment claim is without merit.

### F.  Supervisory Liability / Failure to Act

According to Plaintiff, Defendants Sampson, Austin, Russell, Koenigsknecht, Niemiec, Treirweiler, and Doe are liable under § 1983 because they denied Plaintiff's grievances or failed to correct the actions of other prison officials when they became aware of them.  Government officials may not be held liable for the unconstitutional conduct of their subordinates

under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Sampson, Austin, Russell, Koenigsknecht, Niemiec, Treirweiler, or Doe engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

### G. Conspiracy (§§ 1983, 1985, 1986)

Plaintiff alleges that certain Defendants engaged in a conspiracy covered by 42 U.S.C. §§ 1983 and 1985. He also brings a claim under 42 U.S.C. § 1986, which allows for damages against a person who has knowledge of, and neglects to prevent, "wrongs conspired to be done, and mentioned in section 1985." *Id.*

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action.'" *See Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive

the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Id.*; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

To state a claim for conspiracy under § 1985, a plaintiff must allege facts showing that (1) two or more persons conspired (2) for the purpose of depriving the plaintiff of the equal protection of the laws and (3) that the conspirators committed an overt act (4) that injured the plaintiff.  *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005); *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)).  The § 1985 plaintiff also must demonstrate that the conspiracy was motivated by a class based animus, such as race.  *Radvansky*, 395 F.3d at 314; *Johnson*, 40 F.3d at 839.

For the reasons already stated herein, Plaintiff's allegations fail to show a violation of his right to equal protection (as is necessary to state a claim under § 1985), or of any other federal right (as is necessary to state a conspiracy claim under § 1983).  Thus, the complaint does not state a conspiracy claim under either of those statutes.  Furthermore, Plaintiff does not state a claim under § 1986, because that section is predicated on conduct that violates § 1985.  Consequently, Plaintiff's conspiracy claims under §§ 1983 and 1985, as well as his claim under § 1986, will be dismissed.

### III.  Supplemental Jurisdiction

Plaintiff asserts throughout the complaint that Defendants violated his rights under the Michigan Constitution of 1963, Michigan state law, and MDOC policies.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding

state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).

Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue

of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss

the remaining state-law claims. *Id.*; *see also* 28 U.S.C. § 1367(c)(3) (providing that a court may

decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original

jurisdiction"). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF*

*Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch*

*Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). Here, the balance of the relevant considerations

weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-

law claims will be dismissed without prejudice.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court

determines that Plaintiff's action under 42 U.S.C. §§ 1983, 1985, and 1986 will be dismissed with

prejudice for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42

U.S.C. § 1997e(c). In addition, Plaintiff's claims arising under state law will be dismissed without

prejudice because the Court declines to exercise supplemental jurisdiction over such claims.

The Court must next decide whether an appeal of this action would be in good faith

within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611

(6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no

good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the

$455.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless

Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).

If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.

Dated:  __December 12, 2012__          /s/ Paul L. Maloney
                                        Paul L. Maloney
                                        Chief United States District Judge